**AUSTIN CHEMICAL COMPANY, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 86–01–00134.**

United States Court of International Trade.

Feb. 26, 1987.

Stack & Filpi, Paul F. Stack, Chicago, Ill., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Kenneth N. Wolf, New York City, for defendant.

## OPINION AND ORDER

TSOUCALAS, Judge:

This matter has been submitted to the Court to determine the appropriate classification of D(−) mandelic acid imported from the Republic of Korea in 1985. The merchandise was imported for sale to Eli Lilly and Company (Lilly) to manufacture O-formylmandeloyl chloride, which is further treated to produce an antibiotic drug (Cefamandole Nafate). The D(−) mandelic acid is not present as imported in the antibiotic, rather the final compound contains the mandelic acid moiety (major portion of the molecule).

## BACKGROUND

The imported merchandise was classified by Customs under Schedule 4, Part 1, Subpart B, item 404.46, TSUS:

Cyclic organic chemical products in any physical form having a benzenoid, quinoid, or modified benzenoid structure, not provided for in subpart A or C of this part:

\* \* \* \* \* \*

Other:

Carboxylic acids with alcohol, phenol, aldehyde, or ketone function and other single or complex oxygen-function carboxylic acids and their anhydrides, halides, peroxides, and peracids, and their halogenated, sulfonated, nitrated, or nitrosated derivatives:

Other:

Products provided for in the Chemical Appendix to the Tariff Schedules.

Plaintiff contends that the proper classification is under item 411.91, within Subpart C of Part 1 to Schedule 4, TSUS:

Products suitable for medicinal use, and drugs:

Obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:

Drugs:

Other:

\* \* \* \* \* \*

Anti-infective agents, not specially provided for:

\* \* \* \* \* \*

Mandelic Acid

The issues presented to the Court are: (1) whether the imported D(–) mandelic acid is a drug; and (2) whether this form (or isomer) of mandelic acid is *eo nomine* "mandelic acid" under item 411.91, TSUS. In order for the mandelic acid to be classified under item 411.91, plaintiff must first demonstrate that it meets the criteria of the superior heading "drugs". *Dow Chemicals v. United States*, 10 CIT ——, 647 F.Supp. 1574, 1577 (1986), *appeal dismissed*, No. 87–1041 (Fed.Cir. November 4, 1986). The term "drugs" is defined in Headnote 9 of Schedule 4, Part 1, Subpart C, to include: "those substances having therapeutic or medicinal properties and chiefly used as medicines or as ingredients in medicines." There is no dispute that the D(–) mandelic acid is chiefly used in the manufacture of antibiotics which are medicines.

## DISCUSSION

Plaintiff claims that the D(–) mandelic acid has therapeutic properties, since the antibiotic, Cefamandole Nafate, made without this substance is worthless and would cease to exist for lack of effectiveness. Conversely, defendant maintains that it is the betalactams in the antibiotic which contain the therapeutic properties, and the D(–) mandelic acid only facilitates production of the betalactams, which does not render it therapeutic.

Admitted by stipulation, was the testimony of Fred M. Perry, Ph.D., research advisor for Lilly. Dr. Perry testified that the D(–) mandelic acid is used in the manufacture of cephalosporin antibiotics, such as Cefamandole Nafate, which are medicines with therapeutic value. Cephalosporins, referred to as beta-lactam antibiotics, result in the death of bacterial cell walls. The Cefamandole Nafate compound results from the mandelic acid moiety reacting with formic acid, which is then treated with thionylchloride. This forms D(–) O-formyl-mandeloyl chloride, which undergoes further reactions to produce the Cefamandole Nafate. Dr. Perry stated that without the mandelic acid moiety, "the beta-lactam system of the antibiotic is destroyed" and "Cefamandole made with D(–) mandelic acid shows clearly superior potency and wider spectrum of activity against gram negative bacteria compared to prior cephalosporin antibiotics."

The Government's witness, Dr. Gunda Georg, licensed as a pharmacist, was deemed an expert witness in chemistry. Dr. Georg reiterated the important role played by the D(–) mandelic acid in the synthesis of beta-lactam antibiotics. While she did not controvert the statements made by Dr. Perry, she was of the opinion that the therapeutic properties of the antibiotic lay with the beta-lactam system. She concurred with the dictionary definition of therapeutic and concluded that the D(–) mandelic acid was not therapeutic or medicinal but did not reason why.

While there is apparently no dispute that the D(–) mandelic acid is necessary to prevent the breakdown of the beta-lactams in the ultimate formation of the antibiotic, this begs the question as to whether that quality constitutes a "therapeutic property". The term therapeutic is defined in *Webster's Third New International Dictionary* (1966) as follows:

> therapeutic ... of or relating to the treatment of disease or disorders by remedial agents or methods: CURATIVE, MEDICINAL

and in *Webster's New International Dictionary*, (2d ed. 1948):

> therapeutic ... Med. Of or pertaining to the healing art; concerned with remedies for diseases; curative. Cf. PROPHYLACTIC.

Concededly, this isomer of mandelic acid may not be used alone as a curative; however, it does impart properties to the other substances which are necessary to produce an effective antibiotic. The criterion for a drug is not that it be therapeutic but that it

possess therapeutic properties.[1] The ability of the mandelic acid to prevent the breakdown of the beta-lactams cannot be denied. When a substance which possesses such desirable properties, although incapable of use alone, is combined with other substances to produce the physiological action to correct the deficient condition, it may properly be classified as a drug. *Synthetic Patents Co., Inc. v. United States*, 12 Cust.Ct. 148, C.D. 845 (1944); *Synthetic Patents Co., Inc. v. United States*, 11 Cust.Ct. 147, C.D. 813 (1943). Therefore, it appears that this characteristic which relates to the treatment of disease by a remedial agent or method is thus, a "therapeutic property".

In comparison, it has been held that for purposes of the term "medicinal preparation", the substance itself must possess the therapeutic or curative property. *Biddle Sawyer Corp. v. United States*, 50 CCPA 85, C.A.D. 826 (1963). It was not sufficient that the substance in question imparted properties to another component in the preparation, which was therapeutic. Plaintiff alleges that the case is distinguishable, since at issue therein was the term "medicinal preparation" which differs from the term "drug", in that the latter does not have to be suitable for use as a medicine in its imported form.

Defendant claims that the term "medicinal preparation" is relevant, referring to the origin of item 411.91, TSUS. This provision superseded item 411.94, which in turn replaced item 407.85 of the Tariff Schedules as enacted.[2] Item 407.85 provided for: "Products suitable for medicinal use, and drugs: Obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part: Drugs: Other." In reference to this provision, the *Tariff Classification Study*, Schedule 4, Chemicals and Related Products, Explanatory Notes, at 22, indicates that items 407.20–407.90, under the

subheading "drugs" would encompass those products formally provided for under the heading "medicinals" in the Tariff Act of 1930. The change in terminology was intended for uniformity with no significant change in coverage anticipated. *Id.*

Consequently, defendant argues that "drugs" in the Tariff Schedules is derived from "medicinals" in the Tariff Act of 1930. Thus, defendant urges this Court to apply those cases such as *Biddle Sawyer* which define "medicinal preparations", since the same word (medicinal) when used in different parts of the statute is presumed to have the same meaning unless a contrary intent is indicated. *Productol Chemical Co. v. United States*, 74 Cust.Ct. 138, 151, C.D. 4598 (1975). However, this logic ignores the fact that in the Tariff Act of 1930 the term "drugs" was used in addition to the term "medicinal preparations" and they had distinct meanings. The definition of drugs therein is almost identical to the definition used in Schedule 4 of the Tariff Schedules. To accept defendant's argument would nullify this similarity in treatment of the term drugs. Therefore, while the term "medicinals" may have merged into the term "drugs", that does not necessarily imply that "medicinal preparations" as used in the Tariff Act is synonymous with "drugs" in the Tariff Schedules. Thus, even though according to Dr. Georg, the D(−) mandelic acid in and of itself may not be therapeutic, it is sufficient that it is crucial to the ultimate formation of the antibiotic so that it may be deemed to possess therapeutic properties.

Defendant further contends that the D(−) mandelic acid is not an ingredient in medicine, the second prong in the definition of drugs. Dr. Nicholas Kartinos, plaintiff's Director of Technical Affairs, testified however, that this is an ingredient in medicine and agreed with the following definition of ingredient proffered from *Blaki-*

---

1. Properties are the characteristics of a substance and chemical properties are the chemical reactions of a substance. *Hackh's Chemical Dictionary*, (4th Ed.1969).

2. Item 411.94 was created pursuant to Presidential Proclamation 4768 on June 28, 1980. 45 Fed.Reg. 45,171 (July 2, 1980); and Executive Order 12413 of March 30, 1983, replaced this provision with item 411.91. 48 Fed.Reg. 13,926 (April 1, 1983).

*ston's Pocket Medical Dictionary:* "[a]ny substance that enters into the formation of a compound or mixture." Dr. Kartinos stated that this was consistent with the way the term was used in chemistry. Conversely, Dr. Georg testified that she would not refer to D(–) mandelic acid as an ingredient in medicine, since she limits that term to those ingredients listed on a label of medicine. As an exemplar she referred to the ingredients in cough syrup as the antihistamine and the cough suppressant. Defendant claims that not every chemical substance which enters into the formation of a drug is an "ingredient in medicine" within chemical and technical terminology.

Dr. Georg was of the opinion that mixtures, *not* compounds are composed of ingredients. Plaintiff directs the Court to Schedule 4, Headnote 2(a), defining compounds as substances produced by the reaction of two or more ingredients. Defendant maintains that the definition in Headnote 2(a) is applicable when the term "compounds" is used in that schedule, and the superior heading to item 411.91 does not mention compounds. However, in ascertaining the meaning of a tariff term, the testimony of witnesses is advisory only, and the court may consult extrinsic sources to determine that meaning. *Productol Chemical Co.,* 74 Cust.Ct. at 142 (1975). *Webster's Third New International Dictionary,* (1966) refers to an ingredient as:

2. That which enters into a compound, or is a component part of any combination or mixture: CONSTITUENT. syn. —see element.

*Hackh's Chemical Dictionary,* (4th Ed. 1969) contains the following definition:

**ingredient.** Any constituent of a mixture. Cf. constituent.

**constituent.** (1) An element or part of a compound. Cf. *component* of a mixture. (2) An element or compound formed from the components, ... of a system.

Based on these definitions, it is apparent that for tariff purposes, Congress chose to recognize that before the chemical reaction occurs, the component substances of the compound are properly deemed ingredients. Thus, while Dr. Georg's opinion is entitled to some deference, the ultimate interpretation of the tariff term is a question of law. *Daw Industries, Inc. v. United States,* 714 F.2d 1140, 1141 (Fed.Cir.1983). It would be anomolous to ascribe one meaning to the term compound when actually used in the Tariff Schedules, and another when applying that term. It should be noted that Dr. Georg opined that you could refer to ingredients in compounds; but once a chemical reaction occurs to form the compound, it no longer is comprised of ingredients. In the pharmaceutical field, she prefers to characterize the D(–) mandelic acid as an intermediate in the formation of a drug, and Cefamandole as the only ingredient in Cefamandole. Yet, such a restrictive view of the term ingredients in medicine would mean that each substance enumerated within the subheading drugs would actually have to be the ingredient listed on the label of medicine. In this situation, it would not be logical that Congress intended that the medicine, the Cefamandole itself, be considered the only ingredient in medicine.

The final issue for determination is whether the D(–) isomer is specifically provided for within the tariff term mandelic acid. Absent a clear expression of intent to the contrary, an *eo nomine* designation includes all forms of an article. *International Selling Corp. v. United States,* 62 Cust.Ct. 23, 28, 294 F.Supp. 642, 646 (1969); *Nootka Packing Co. v. United States,* 22 CCPA 464, 470, T.D. 47464 (1935). Isomers are compounds having the same molecular weight and chemical formula, but different properties and arrangement of the atoms. Mandelic acid has three forms or isomers: D(–); L( + ); and DL or racemic. The DL form is a combination of the D(–) and L( + ) isomers. Defendant maintains that only the DL isomer is within the parameters of item 411.91.

Mandelic acid is described in chemical and drug reference materials as a useful bacterial agent in urinary infections. In two sources, the properties of mandelic acid listed are, in fact, those of the DL racemic form, *The Condensed Chemical Dictionary* 679 (5th Ed. 1956); Howard, *Modern Drug Encyclopedia and Thera-*

*peutic Index* 561 5th Ed. (1952), but in *Hackh's Chemical Dictionary*, the three isomers of mandelic acid are recognized. *Id.* at 405–406. Generally, however, chemical references do not identify the different isomers of mandelic acid or treat them separately. Billups, *American Drug Index* 371 (25th Ed.1981); Burger, *Medicinal Chemistry*, Vol. 2 at 1003 (1951). Dr. Kartinos indicated that mandelic acid encompasses all forms unless the specific isomer is intended. Nonetheless, defendant points to the commercial documents introduced by plaintiff specifying D(–) mandelic acid, and to Dr. Georg's testimony that mandelic acid in her scientific community, refers to the racemic form.

In support of its position, defendant cites *Productol Chemical Co.*, 74 Cust.Ct. 138, where merchandise containing a very high concentration of a single isomer, 2,4 xylenol, was not classifiable under the *eo nomine* provision for cresylic acid. However, of import in that decision was that a clear distinction was drawn in the trade between cresylic acid and xylenol, and the Tariff Schedules had provided for each separately. Furthermore, when the substance was of a certain concentration, it was common in the trade to refer to it by the nominal designation of the isomer, rather than as cresylic acid. In contradistinction, there is no separate provision in the Tariff Schedules for the different isomers of mandelic acid. While the merchandise may have been identified for purchase as D(–) mandelic acid, rather than generically as mandelic acid, that does not form the basis to conclude that this isomer is something other than the mandelic acid described in item 411.91, TSUS. How a product is usually offered in the trade does not prevent it from being offered in less usual forms. *International Selling Corp. v. United States*, 62 Cust.Ct. 23, 27, 294 F.Supp. 642, 645 (1969). Since the merchandise in issue satisfies the superior heading of drugs in that it has therapeutic properties and is an ingredient in medicine, which are the only qualifiers of this *eo nomine* provision, the D(–) mandelic acid is properly classifiable under item 411.91, TSUS.

## CONCLUSION

 The imported merchandise, the D(–) isomer of mandelic acid meets the definition of a drug. It possesses therapeutic properties in that its primary use is in the ultimate formation of an antibiotic. The effectiveness of the medicine with the mandelic acid was not disputed. Furthermore, the meaning of the tariff term "ingredients in medicine" is not limited in this situation to the final compound itself, but includes the D(–) mandelic acid, a crucial substance for the drug to be effective. Finally, this isomer of mandelic acid is within the purview of item 411.91, TSUS, since there are no limitations associated with this provision, other than the requirements of the superior heading "drugs". Plaintiff has met its burden in overcoming the presumption of correctness attached to the Customs decision. Therefore, judgment must be entered in plaintiff's favor since the merchandise is properly classifiable under item 411.91, TSUS. So ordered.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED: that the merchandise imported under cover of the entries that are the subject of this action are properly classifiable under item 411.91, TSUS; and it is further

ORDERED, ADJUDGED and DECREED: that the United States Customs Service shall reliquidate the entries under item 411.91, TSUS, together with duty at the rate prevailing at the time of entry, and shall refund any excess duties paid together with interest, as provided by law.