**AUSTIN CHEMICAL COMPANY, INC.,**
Plaintiff–Appellee,

v.

**The UNITED STATES,**
Defendant–Appellant.

No. 87–1331.

United States Court of Appeals,
Federal Circuit.

Dec. 31, 1987.

Paul F. Stack of Stack & Filpi, Chicago, Ill., argued for appellee. With him on brief was John J. Kakacek of Stack & Filpi, Chicago, Ill.

Kenneth N. Wolf of the Dept. of Justice, Commercial Litigation Branch, Washington, D.C., argued for appellant. With him on brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and Joseph I. Liebman, Atty. in Charge, International Trade Field Office.

Before FRIEDMAN and DAVIS, Circuit Judges, and COWEN, Senior Circuit Judge.

FRIEDMAN, Circuit Judge.

The United States appeals, pursuant to 28 U.S.C. § 1295(a)(5) (1982), from a judgment of the United States Court of International Trade that reversed a Customs Service classification of a drug, 659 F.Supp. 229 (Ct. Int'l Trade 1987). We affirm.

I

A. The issue in this case is the proper classification for Customs purposes of imported D(—) mandelic acid. Mandelic acid can exist in two three-dimensional forms or "isomers": D(—) and L(+). A one-to-one (or "racemic") mixture is called DL mandelic acid. When only one isomer is present the compound is said to be "optically pure."

Austin Chemical Company (Austin) imported D(—) mandelic acid from Korea and sold it to Eli Lilly & Company (Lilly). Lilly used it to manufacture Cefamandole Nafate, a cephalosporin or beta-lactam antibiotic. Synthesizing the antibiotic is a multistep process during which the mandelic acid undergoes various chemical changes. When the synthesis is complete, the antibiotic has a mandelic acid "moiety" or major portion of the original mandelic acid molecule.

The antibiotic kills bacteria by inhibiting the growth of bacterial cell walls. Bacteria, however, are not defenseless. They produce enzymes (called beta-lactamases) which can render the antibiotic ineffective. The mandelic acid moiety protects the beta-lactam portion of the drug which kills bacteria from these destructive bacterial enzymes, thereby enhancing the drug's effectiveness.

The United States Customs Service classified the imported D(—) mandelic acid under item 404.46 of the Tariff Schedules of the United States (TSUS):

Cyclic organic chemical products in any physical form having a benzeneoid, quinoid, or modified benzeneoid structure, not provided for in subpart A or C of this part:

\* \* \* \* \* \*

Other:

| Products provided for in the Chemical Appendix to the Tariff Schedules. | 1.7¢ per lb. + 17.9% ad val. |
|---|---|

Austin protested the classification and sought reclassification under TSUS 411.91, under which the merchandise would enter duty free:

Products suitable for medicinal use and drugs:

Obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:

Drugs:

Other:

\* \* \* \* \* \*

Anti-infective agents, not specially provided for:

\* \* \* \* \* \*

Mandelic acid.

After the District Director of Customs denied Austin's protest, Austin brought suit in the Court of International Trade seeking reclassification and a refund of the duties paid plus interest.

The issues at trial were whether the TSUS definition of "drugs" includes D(−) mandelic acid and whether D(−) mandelic acid is *eo nomine* "mandelic acid" under TSUS item 411.91.

B. TSUS Schedule 4, part 1, subpart C, headnote 9, defines "drugs" as:

those substances having therapeutic or medicinal properties and chiefly used as medicines or as ingredients in medicines.

Thus, in order to classify D(−) mandelic acid as a "drug" it must have therapeutic or medicinal properties and be chiefly used as an ingredient in medicine. The trial court found that both prongs of the test were met.

The court found that D(−) mandelic acid had therapeutic properties because the mandelic acid moiety enhances the antibiotic activity of the drug:

Concededly, this isomer of mandelic acid may not be used alone as a curative; however, it does impart properties to the other substances which are necessary to produce an effective antibiotic. The criterion for a drug is not that it be therapeutic but that it possess therapeutic properties. The ability of the mandelic acid to prevent the breakdown of the beta-lactams cannot be denied. When a substance which possesses such desirable properties, although incapable of use alone, is combined with other substances to produce the physiological action to correct the deficient condition, it may properly be classified as a drug. *Synthetic Patents Co., Inc. v. United States,* 12 Cust.Ct. 148, C.D. 845 (1944); *Synthetic Patents Co., Inc. v. United States,* 11 Cust.Ct. 147, C.D. 813 (1943). Therefore, it appears that this characteristic which relates to the treatment of

disease by a remedial agent or method is thus, a "therapeutic property".

659 F.Supp. at 231–32 (footnote omitted).

The court reasoned that D(−) mandelic acid is used as an ingredient in medicine because compounds (i.e., the antibiotic which is a medicine) are composed of ingredients (i.e., mandelic acid). The court rejected the testimony of the government's witness, Dr. Georg, that "she would not refer to D(−) mandelic acid as an ingredient in medicine, since she limits that term to those ingredients listed on a label of medicine." 659 F.Supp. at 233.

The court held that D(−) mandelic acid should have been classified as a drug since it had therapeutic properties and was chiefly used as an ingredient in medicine.

C. The trial court further held that D(−) mandelic acid is *eo nomine* "mandelic acid" under TSUS item 411.91. The court reasoned that

there is no separate provision in the Tariff Schedules for the different isomers of mandelic acid. While the merchandise may have been identified for purchase as D(−) mandelic acid, rather than generically as mandelic acid, that does not form the basis to conclude that this isomer is something other than the mandelic acid described in item 411.91, TSUS.... Since the merchandise in issue satisfies the superior heading of drugs in that it has therapeutic properties and is an ingredient in medicine, which are the only qualifiers of this *eo nomine* provision, the D(−) mandelic acid is properly classifiable under item 411.91, TSUS.

659 F.Supp. at 234.

The court's judgment ordered the Customs Service to "reliquidate the [merchandise] under item 411.91, TSUS, together with duty at the rate prevailing at the time of entry, and [to] refund any excess duties paid together with interest, as provided by law." *Id.*

II

The government challenges the trial court's rulings that D(−) mandelic acid has therapeutic properties and is used chiefly

as an ingredient in medicine. Both arguments rest primarily on the fact that only a moiety of the molecule prevents the breakdown of the antibiotic. The government contends that because Austin imported D(−) mandelic acid, and not the moiety, classification of D(−) mandelic acid as a drug was improper.

The rule of construction of tariff statutes is that " 'in order to produce uniformity in the imposition of duties, the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported.' " *United States v. Citroen*, 223 U.S. 407, 414–15, 32 S.Ct. 259, 260, 56 L.Ed. 486 (1912) (citations omitted); *Carling Elec. Co. v. United States*, 757 F.2d 1285, 1287 (Fed.Cir.1985). According to the government, this rule requires that for D(−) mandelic acid to be classified as a drug, the imported product itself must have therapeutic properties.

■ The Court of International Trade properly relied on reference materials, expert testimony and dictionary definitions in ruling that "therapeutic" properties include the imparting of "properties to the other substances which are necessary to produce an effective antibiotic." 659 F.Supp. at 231.

[I]t is fundamental that tariff terms are to be construed in accordance with their common meaning. It is equally fundamental that common meaning is a question of law to be determined by the court and that in determining common meaning, the court may consult dictionaries, lexicons, the testimony of record, and other reliable sources of information as an aid to its knowledge.

*Pistorino & Co. v. United States*, 461 F.Supp. 331, 334, 81 Cust.Ct. 37, 41, C.D. 4763 (1978) (citation omitted), *aff'd*, 599 F.2d 444 (C.C.P.A.1979).

The court noted the testimony of Dr. Perry, Lilly's research advisor, that D(−) mandelic acid had an important role in making the antibiotic effective, and referred to dictionary definitions of "therapeutic" as "remedies" "relating to the treatment of disease." 659 F.Supp. at 231.

The court considered but rejected the testimony of the government's witness, Dr. Georg, who "was of the opinion that the therapeutic properties of the antibiotic lay with the beta-lactam system. She concurred with the dictionary definition of therapeutic and concluded that the D(−) mandelic acid was not therapeutic or medicinal but did not reason why." 659 F.Supp. at 231.

In light of the evidence that the mandelic acid moiety prevents the breakdown of the antibiotic, and the dictionary definitions of "therapeutic," we cannot say the trial court erred in concluding that D(−) mandelic acid has therapeutic properties.

■ The government also contends that the trial court improperly determined that D(−) mandelic acid is an ingredient used in medicine. The government argues that "ingredient" is not the same as "ingredient used in medicine." It relies on Dr. Georg's testimony that she would only consider items listed on the label of a drug to be ingredients in medicine. According to Dr. Georg, "mixtures, *not* compounds are composed of ingredients," and the only "ingredient" in the antibiotic is the antibiotic itself. 659 F.Supp. at 233 (emphasis in original). The government asserts that the trial court erroneously relied upon the testimony of Austin's witness, Dr. Kartinos, who adopted the definition of "ingredient" from a medical reference book.

The weight to be accorded expert testimony is a matter for the trial court, not the appellate court, to determine. The Court of International Trade cannot be faulted for rejecting Dr. Georg's definition of "ingredient" and following the dictionary definitions of that term, which accord with the views of Dr. Kartinos. The court did not err in holding that D(−) mandelic acid was used as an ingredient in medicine within the meaning of the TSUS definition of drug.

The trial court's determination that D(−) mandelic acid is *eo nomine* the drug "mandelic acid" under TSUS 411.91 has not been shown to be in error. The government has not demonstrated that the tariff item

"mandelic acid" does not include the D(−) isomer of that product. "Mandelic acid" is a comprehensive term, and there is no indication that Congress intended to exclude from it the D(−) isomer or to limit the term, as the government would do, to DL mandelic acid, which is comprised of an equal mixture of the D(−) and L(+) isomers. As this court has stated:

> One who argues that a term in the tariff laws should not be given its common or dictionary meaning must prove that "there is a different commercial meaning in existence which is definite, uniform, and general throughout the trade."

*Rohm & Haas Co. v. United States,* 727 F.2d 1095, 1097 (Fed.Cir.1984) (citing *Moscahlades Bros. v. United States,* 42 C.C.P. A. 78, 82 (1954)). The government has not shown that "mandelic acid" has a commercial meaning that would exclude D(−) mandelic acid.

### CONCLUSION

The judgment of the Court of International Trade is

AFFIRMED.