**MARUBENI AMERICA CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. No. 95–168.
Court No. 91–10–00730.

United States Court of
International Trade.

Oct. 3, 1995.

**1102**

Fitch, King and Caffentzis (Richard C. King,), for plaintiff.

Frank W. Hunger, Assistant Attorney General; Joseph I. Leibman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (James A. Curley,); Jacob D. Diamond, Office of the Assistant Chief Counsel, United States Customs Service, of counsel, for defendant.

## OPINION AND ORDER

NEWMAN, Senior Judge:

### INTRODUCTION

The issue presented concerns the proper tariff classification and rate of duty to be assessed by the United States Customs Service ("Customs") on certain internally grooved seamless copper tubing, sold under the trade name "Thermofin" by Hitachi Cable Ltd. of Japan and imported by plaintiff during 1989–90.

Jurisdiction is predicated on 28 U.S.C. § 1581(a), and therefore Customs' classification decision is before the court for *de novo* review in accordance with 28 U.S.C. § 2636. Currently before the court for decision are cross-motions for summary judgment.

The merchandise was classified by Customs under the provision for profiles of refined copper in subheading 7407.10.10 of the Harmonized Tariff Schedule of the United States ("HTSUS"), effective January 1, 1989, and duty was assessed at the rate of 6.3 per centum ad valorem.

Plaintiff claims that the merchandise is properly dutiable as seamless tubes and pipes of refined copper under subheading 7411.10.10, HTSUS at the rate of 1.5 per centum ad valorem.

### UNDISPUTED FACTS

The record before the court on the cross-motions comprises: a sample 8 inch piece of the imported ⅜ths inch diameter Hitachi "Thermofin" tubing as well as a sample piece of the "mother" tube from which the imported tubing was drawn in the production process (plft's exh. 1), 4½ inch piece of Hitachi LFT–2 low fin copper tube (plft's exh. 27), an affidavit of Hajime Ichiki (plft's exh. 2), a declaration of Osamu Kawamata (plft's exh. 24), United States Patent Nos. 4,373,366 and 4,658,892 (plft's exh. 3) describing in detail the production process for the imported merchandise and the merchandise itself, and a toy top (plft's exh. 23) submitted by plaintiff; declarations of Dr. Thomas J. Rabas and Norman R. Clevinger were submitted on behalf of defendant. Also, copies of marketing literature and numerous other documentary exhibits were submitted in connection with the parties' motion papers.

The merchandise in its condition as imported has a smooth circular outer surface, is seamless, of regular cross-section, with helical ridges and grooves spiralling the length of the tube on the inner surface. As a consequence of the internally grooved surface, the imports while having a uniform cross-section, do not have a uniform wall thickness.

The Thermofin tubing was imported in various diameters ranging from ⁵⁄₁₆ inches—⅝ inches and packed in wound coils. After importation, the tubing was straightened, cut, bent and assembled into evaporator/condenser coils or heat exchanger units for air conditioning and refrigerating systems. The internal grooving affects the movement of the liquid or gas passing through the tubing enabling it to perform its function in a refrigeration system more efficiently since an extended internal surface area of the tubing is exposed to refrigerant fluid that passes through the tube and also because the grooved inner surface creates increased turbulence in the refrigerant fluid. Enhanced inner wall surfaces in copper tubing were developed about 1976 by Hitachi, and represented a significant advancement in efficiency of heat transfer for refrigeration and air conditioning systems over tubing having a smooth inner wall.

While the inner grooved configuration of the tubing itself causes a linear to rotary motion of liquid passing through the tube, neither the tube nor the internal grooving rotates or otherwise moves so as to actively transmit motion to the liquid or gas passing through the tubing. Both the linear and then rotary motion of the liquid passing through the tubing result from the pressure applied by the system's compressor to the refrigerant fluid in the tubing which simply follows the internal wall configuration of ridges and grooves. The purpose of the ridges and grooves is not to actively transmit motion to the refrigerant fluid (which is accomplished by the compressor), but to enhance the efficiency of heat transfer by exposing the refrigerant fluid to more surface area and creating within the refrigerant fluid

a state of turbulence due to the linear/rotary motion.

According to the United States Patents (exhibit 3), the spiral grooves on the inner surface of the tubes were produced by a "grooving machine," and the merchandise is referred to as an "inner surface grooved tube." Further, plaintiff's advertising literature (exhibit 4) states that the THERMO-FIN tubes have "inner grooves." Thermofin tubes have never been marketed in the United States as threaded tubes.

## DISCUSSION

### I.

Summary judgment pursuant to CIT Rule 56 is appropriate in this case inasmuch as no genuine issue as to any material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed.Cir.1987).

■ Under Chapter 74, Note 1(h), HTSUS ("Note 1(h)"), "tubes and pipes" are defined as: "Hollow products, coiled or not, which have a uniform cross section with only one enclosed void along their whole length in the shape of circles * * *, *and which have a uniform wall thickness.* * * * Tubes and pipes of the foregoing cross sections may be * * * *threaded* * * *" (emphasis added). According to defendant, because the imported product is not "threaded," lack of uniform wall thickness precludes classification of the merchandise under the HTSUS as a tube (*i.e.*, as defined in Note 1(h)) and requires classification of the imports as profiles.

To be classifiable as a tube or pipe under Heading 7411, a product must, with certain exceptions, meet the specification in Note 1(h) of a "uniform wall thickness." The definitional specification of "uniform wall thickness" under Note 1(h) is concededly absent in the imports by virtue of their internal grooving. The relevant exception in Note 1(h) to the requirement of uniform wall thickness is for a product that is "threaded." Hence, the imports must be excluded from classification as "tubes or pipes" and classifiable as "profiles" unless the imports by vir-

tue of their internal grooving are "threaded" within the meaning of that term in Note 1(h).

Accordingly, references herein to the imports as "tubes" or "pipes" are merely generically descriptive and carry no suggestion as to the proper tariff classification of the merchandise, which must be based on the pertinent definitions in the HTSUS.

### II.

The controlling dispute, then, between the parties is not whether in a dictionary definition or *generic* sense the imports are tubes or pipes, but rather whether the imports meet the HTSUS definition of those products in Note 1(h), particularly the exception to the "uniform wall thickness" requirement of "threaded." *See* Rule 6, General Rules of Interpretation of the Harmonized System ("For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related notes . . ."). *Cf. Clipper Belt Lacer Co. v. United States*, 14 CIT 146, 738 F.Supp. 528 (1990), *aff'd* 923 F.2d 835 (Fed.Cir.1991).

The relevant product definitions in Note 1 read:

(e) *Profiles*

Rolled, extruded, drawn, forged or formed products, coiled or not, of a uniform section along their whole length, which do not conform to any of the definitions of * * * tubes or pipes. * * *

(h) *Tubes and pipes.*

Hollow products, coiled or not, which have a uniform cross section with only one enclosed void along their whole length * * * and which have a uniform wall thickness . . . Tubes and pipes of the foregoing cross sections may be * * * *threaded* * * *. [Emphasis added.]

■ As the Note 1(h) definition for tubes and pipes, *supra*, provides statutory specifications for classification under Heading 7411, it is the tariff definition and specifications, not common or commercial meaning, that is conclusive for classification purposes *See Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed.Cir.), *cert. denied*, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358

(1988) (definitional limitation of term in tariff headnote is controlling as to classification regardless of common or commercial meaning). *See also Overton & Co. v. United States*, 85 Cust.Ct. 76, 80–81, C.D. 4875 (1980). Therefore, the court need not ascertain or address the common or commercial meaning of "tube" or "pipe," or determine whether or not the imports fall within the *common or commercial* meaning of those terms. Those are not issues before the court.

### III.

■ In the interest of narrowing the legal issue in this case, defendant admits that the imported product would meet the definition for "tubes and pipes" in Note 1(h) if it had a uniform wall thickness; concededly, due to the internally grooved surface it does not. The issue, then, is narrowed to whether the grooving meets the definitional specification "threaded." The court can determine the tariff meaning of that term as a matter of law, *W.R. Filbin & Co., Inc. v. United States*, 945 F.2d 390, 392 (Fed.Cir.1991), which may be resolved on a motion for summary judgment. *Digital Equipment Corp. v. United States*, 889 F.2d 267, 268 (Fed.Cir.1989). *See also Clipper Belt Lacer*, 923 F.2d at 837.

■ While Note 1(h) defines tubes and pipes, the term "threaded" in the Note is itself statutorily undefined. Tariff terms that are statutorily undefined are construed in accordance with their common and popular meaning, in the absence of a proven commercial meaning different from the common meaning or contrary legislative intent. *Lynteq, Inc. v. United States*, 976 F.2d 693, 697 (Fed.Cir.1992); *E.M. Chemicals v. United States*, 920 F.2d 910, 913 (Fed.Cir.1990). Neither party urges any special commercial designation for the term "threaded" different from the common meaning. Although there is no dispute that the imports are not known in the trade as "threaded" tubes, fundamentally, it is the *common meaning of the term at issue* and salient characteristics of the merchandise that are controlling of its tariff classification, and not whether or not the merchandise is known in the trade by the

tariff nomenclature. *See Clipper Belt Lacer Co., supra.*

■ "It is well-settled that the meaning of tariff terms is a question of law, while the determination whether a particular item fits within that meaning is a question of fact." *E.M. Chemicals v. United States*, 920 F.2d 910 (Fed.Cir.1990); *Stewart–Warner Corp. v. United States*, 748 F.2d 663 (Fed.Cir.1984). As indicated above, the common meaning of the term "threaded" is controlling in this case, and determination of such meaning presents a question of law. *See W.R. Filbin & Co., supra; Austin Chemical Co., Inc. v. United States*, 835 F.2d 1423 (Fed.Cir.1987); Sturm, *Customs Law & Administration*, § 52.6 ("The common meaning of a tariff term is not a question of fact, but a question of law to be decided by the court. [case cited.] However, whether a particular item fits within that meaning is a question of fact."). "To assist it in ascertaining the common meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Brookside Veneers, Ltd.*, 847 F.2d at 789. *See also Marubeni Am. Corp. v. United States*, 35 F.3d 530 (Fed.Cir.1994). Where a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which definition best invokes the legislative intent. *Richards Medical Co. v. United States*, 910 F.2d 828 (Fed.Cir.1990).

With regard to the dispositive issue of whether the imports are "threaded" within the common meaning of that term, the parties cite numerous lexicographic, encyclopedic and scientific authorities, and the industry nomenclature applied to the imports and products similar thereto. An analysis of the cited authorities makes it evident that the term "threaded" has both physical and functional connotations. For example, the *McGraw Hill Encyclopedia of Science and Technology*, 6th ed., Vol. 18 (1987), p. 329 states with regard to threading:

The forming of a ridge and valley of uniform cross section which spiral about the inner or outer diameter of a cylinder or cone in an even and continuing manner.

The work must be produced with sufficient uniformity and accuracy so that the resulting threaded part will accomplish its *intended purpose of fastening, transmitting motion or power, or measuring.* [Emphasis added.]

*Cf. Atlas Copco North America, Inc. v. United States,* 17 CIT 1163, 1166–67, 837 F.Supp. 423, 426 (1993) (common meaning of "bolt" was not merely a matter of physical structure, but connoted a functional element (attachment or fastening) "which relates to use in the real world.")

As to the factual aspects of whether the imported tubing was "threaded," there is no dispute in this case concerning the physical structure or configuration of the internal ridges and grooves in the tubing or concerning the manner in which the ridges and grooves perform their function in the enhancement of heat transfer. After deciding as a matter of law the common meaning of the term "threaded" as used in Note 1(h), the court must then determine, whether such meaning encompasses the internal ridges and grooves of plaintiff's tubing, the physical characteristics and function of which are undisputed. *E.M. Chemicals, supra.*

Plaintiff, stressing primarily *physical form*—spiral ridges and grooves—posits that the foregoing are the essence of threads. To the extent that the common meaning of "threaded" has functional connotations, plaintiff claims that the spiral grooving in the merchandise "transmits motion," and consequently, meets such functional connotation of the common meaning of "threads."

Defendant maintains that, like the common meaning of "threaded" as applied to such articles as screws, bolts, nuts, etc., the spiral grooving of a tube or pipe must function as a means for attachment or coupling. Distinguishing the function of the internal grooving of the imports for heat transfer applications from the functions of coupling or attachment as commonly connoted by the term "threaded," defendant insists that the internal grooving of the imports have no function in the "transmission of motion."

■ As previously noted, the parties have cited various lexicographic, encyclopedic and scientific materials defining and describing the physical characteristics and functions of "threads": *Funk & Wagnalls New International Dictionary of the English Language* (1987), p. 1308; *Webster's New World Dictionary,* Second College Ed. (1984); *Webster's Third New International Dictionary of the English Language, Unabridged* (1993); *Encyclopedia Britannica,* vol. 20 (1973), p. 92; *McGraw–Hill Encyclopedia of Science & Technology,* 5th Ed. (1982), pp. 126–129, 692–93; National Bureau of Standards *Handbook H28* (1969), *Screw–Thread Standards for Federal Services,* Part 1, §§ 1.01, *et. seq.,* and other authorities. From the foregoing extensive lexicographic and encyclopedic authorities, the declaration of Doctor Rabas, a highly qualified engineering specialist in heating, refrigeration and air conditioning equipment and an expert in heat transfer, the court must agree with defendant that *as related to tubes and pipes,* the term "threaded" as used in Note 1(h) contemplates spiral grooving for attachment or coupling of sections of tubes with complementary "threaded" components. The internally grooved surface of the imported tubing is not used for coupling or attachment, but rather serves only to extend the surface area of the tubing and create turbulence to increase the efficiency of heat transfer from the refrigerant fluid.

United States Patent No. 4,373,366 dated February 15, 1983, submitted by plaintiff, covers a "grooving machine" for performing a "grooving operation," *viz.,* forming "thin continuous spiral grooves formed in the inner surface of the metal pipe." In no context whatever, are the spiral grooves produced by the grooving machine referred to as "threads" in patent No. 4,373,366.

Similarly, in Patent No. 4,658,892 covering heat transfer tubes with grooved inner surface or "inner surface grooved tubes" the inner wall is described as having spiral grooves trapezoidal in shape, formed from triangular ridges at regular intervals having a certain helix angle. Again, in no context are the helical grooves and ridges ever referred to as "threads" in this patent.

■ Plaintiff cites as support for its position that the imports are "threaded" a published study, "Effect of Surface Roughness

on the Rate of Mass Transfer to a Pipe Wall in the Mass Transfer Entry Region," 59 *Canadian Journal of Chemical Engineering* (Dec. 1981), authored by members of the faculty of the Chemical Engineering Department at Alexandria University, Alexandria, Egypt (plft's exh. 8). Plaintiff points up that in this study, the writers explained that surface roughness in the inner surface of a section of pipe "was made by cutting threads." However, the article also uses the term "threads" in the following context: "The three sections [of pipe] were *connected* to form one straight tube using a *threaded plastic sleeve * * *.*" (Emphasis added.) It is the latter function of connection or attachment of pipe sections that is commonly mentioned by lexicographers in defining "threads" or "threaded," not creation of surface roughness in a pipe wall for enhancement of heat transfer. In any event, as aptly pointed up by defendant, the Canadian scientific journal study by the Egyptian writers cannot be taken to authoritatively reflect the common meaning of terms as used in the United States.

In support of its position that the imports are known as "internally finned" tubes and not as "threaded" tubes, defendant calls attention to *Principles of Enhanced Heat Transfer*, 1994, p. 201, a Wiley–Interscience publication, John Wiley & Sons, Inc., Figure 8.1(b) (deft's exh. C). The Wiley text describes integral internally *finned* tubes (including helically finned surfaces) and depicts the inner grooved surface feature of a product that in form and function is virtually the same as the helically grooved imports. Significantly, Hitachi Cable's "Thermofin" tube, which is the imported product, is specifically described in the publication as a "micro-fin tube." *Id.* at 446–48.

Similarly, Sumitomo Light Metal Industries, Ltd., a supplier of enhanced tubes competitive with the imported product, describes its internally finned tubing for air conditioning as "ripple finned tubes." Deft's exh. D., p. 15. Notwithstanding the *physical resemblance* of the internal spiral grooving of the Hitachi Thermofin tubes to "threading" for coupling or attachment, not a scintilla of evidence has been adduced by plaintiff showing that any authoritative source regards, or has ever referred to, those or similar grooved or enhanced heat transfer products as "threaded" tubes.

## IV.

Recognizing the obvious untenability of simply relying on the physical form of spiral ridges and grooving as fully comporting with the common meaning of "threaded," Marubeni contends that if function is relevant to the issue, then the import's internal grooving functions to "transmit motion" to the refrigerant fluid.

Defendant maintains that "threads," as that term is commonly understood in relation to tubes and pipes, function for coupling or attachment in the same manner as screw threads, and in performing such function, tube or pipe threads "transmit motion" in the same sense that screw threads transmit motion.

What is meant by "transmission of motion" as applied to screw threads is well explained in *The Way Things Work* (1971), Vol. 2, Simon and Schuster, New York, p. 156 (deft's exh. B): "Screw threads are used for the purpose of fastening (screws and bolts) and for the transmission of motion: e.g., a *rotating* screw spindle imparts a longitudinal motion to a nut mounted on it" (emphasis added). Further, as explained by Dr. Rabas' declaration submitted by defendant, "transmission of motion" occurs when one *moving body* causes a second body to be placed in motion, as in the case of a radio in which the rotation of a knob causes a station indicator to move in a linear manner across a dial. By contrast, the spiraling movement of liquid or gas inside the imported tubes through the internal grooving to create turbulence in the refrigerant fluid is not due to movement or rotation of the tube or its internal grooves, which remain stationary. Rather, the impetus for both the linear and rotary motion of refrigerant through the internally grooved tube is due to a pressure difference generated by an external compressor, with the internal grooves passively altering the motion of liquid or gas from linear to rotary inside the tube.

Thus, while the internal grooves of the imported product cause liquid or gas passing through it to alter its direction of motion from linear to rotary flow, both the linear and rotary flow of the refrigerant substance within the tube is simply the *result* of the work of the compressor and the liquid or gas simply follows the internal contours of the grooves or spiral ridges. Plainly, there is no transmission of motion from the *internal grooves* of the imported product to the liquid or gas, whether the flow be linear or rotary. As an analogy, a curved and winding mountain road dictates the *direction* of the moving traffic, but does not transmit motion to or produce movement of the vehicles travelling on the road. In use, the imports are not rotated to produce a change from linear to rotary motion of the liquid or gas, nor does the linear or rotary motion of the refrigerant substance cause the tube or its grooving to rotate.

Plaintiff appears to concede that the *linear* motion of the liquid or gas passing through the system is generated by the compressor, but suggests that the compressor plays no role in the *rotary* motion, the latter motion being "transmitted" solely by the internal grooving. What plaintiff apparently chooses to ignore is the obvious fact that if the system's compressor ceases to function, there will be little, if any, motion of the refrigerant fluid substance in the tubing—either linear or rotary. Hence, the helical grooving *per se* does not transmit motion.

Plaintiff's proffered example of a child's top (exh. 23), hand activated by pushing down and pulling up on the handle, which then causes the *connected* spirally grooved rod running through the body of the top *to move up and down* and thereby rotate the body of the top around the rod, fails to support plaintiff's position. Concededly, the up and down motion of the rod running through the body of the top transmits motion to the rotating body of the top. However, the internal grooving of the imported tubing

does not move in any direction. In short, unlike the transmission of motion by the vertical movement of the rod or spindle of a top applied by pushing or pulling of the handle, in the imports there is no "transmission of motion" from the stationary grooving to the refrigerant or from the latter to the former.[1]

Plaintiff's contention that there is "transmission of motion" in the tubing from the liquid or gas flowing linearly (caused by an external compressor) to the liquid or gas caused to flow in a rotary motion by the spiral grooving is ingenuous. There still is no transmission of motion from the stationary spiral grooving to either the linear or the rotary flow, both of which passively follow the contours of the tube's grooving under the impetus of the compressor. By contrast, the rotary motion of screw *threads* (*i.e.,* by turning a screwdriver) is the impetus for the linear motion of the *body* of the screw penetrating a piece of wood. Similarly, the rotary motion of the threads of a bolt is the impetus for the linear motion of the body of the bolt as it moves through the corresponding threads of a nut.

### V.

▮▮▮▮ In furtherance of its efforts to include spiral grooving for enhancement of heat transfer within the term "threaded" as used in Note 1(h), plaintiff urges the court to apply the well settled rule of tariff classification that absent a contrary legislative intent, an *eo nomine* designation (classification by name) without terms of limitation includes all forms of the article. *Nootka Packing Co. v. United States,* 22 CCPA 464, T.D. 47464, 1935 WL 2283 (1935). *See also, Hasbro Indus., Inc. v. United States,* 879 F.2d 838, 840 (Fed.Cir.1989).

While the tariff classification in Heading 7411 for "tubes and pipes" standing alone may be an *eo nomine* designation, clearly the term "threaded" in Note 1(h) is not an *eo*

---

**1.** As explained by plaintiff, the top could be operated in an inverted or upside-down position, in which case the rod (held inverted by the handle) remains totally stationary and the top rotates around the rod's spiraled grooving while descending simply by the pull of gravity. Obvious-

ly, if the top were used in that unorthodox manner, there would be no "transfer of motion" from the stationary rod to the top, and the pull of gravity would provide the only impetus for the descent of the top's body toward the handle.

*nomine* classification. Indeed, the term "threaded" is not *per se* any tariff classification for goods, but rather is a *term of limitation and exception* within the definition of tubes and pipes in Note 1(h). Moreover, Note 1(h) itself by defining the products to be classified as tubes and pipes is a clear expression of legislative intent that not all forms of such articles are to be included within the tariff classification, as plainly that would make the purpose of a statutory definition superfluous. Therefore, plaintiff's reliance on *Atlas Copco, supra,* citing *A.L. Liebman & Sons, Inc. v. United States,* 65 Cust. Ct. 85, C.D. 4059 (1970), which holds that the common meaning of "bolts," a tariff classification which was statutorily undefined and unqualified under the TSUS, was not limited to certain types of bolts, is inapposite in the current case. In short, the rule broadly applied to determining the scope of undefined and statutorily unlimited *eo nomine* designations is simply not applicable in construing the term "threaded," itself a term of limitation in the Note 1(h) definition of tubes and pipes.

### VI.

▮ Plaintiff further argues that the meaning of "threaded," as reflected by the witnesses' declarations submitted by defendant, are irrelevant because it is common meaning and not commercial designation that is controlling. It is true that neither party has claimed nor established a "commercial designation" for the term "threaded." However, plaintiff overlooks that common and commercial meanings are presumed to be the same, *Sangamo Capacitor Div., of Sangamo Weston, Inc. v. United States,* 779 F.2d 30 (Fed.Cir.1985), and absent proof that the common and commercial meanings differ, the usage of terms by the trade is presumed to reflect their common meaning. Moreover,

Congress is presumed to know the language of commerce, and to have framed tariff acts so as to classify commodities according to the general usage and denomination of the trade. *Esco Manufacturing Co. v. United States,* 63 CCPA 71, C.A.D. 1167, 530 F.2d 949 (1976); *Nylos Trading Co. v. United States,* 37 CCPA 71, C.A.D. 422, 1949 WL 4913 (1949). Accordingly, when a tariff term is not defined in either the HTSUS or its legislative history, the correct meaning of a term in a tariff provision is the common meaning *understood in trade and commerce. Schott Optical Glass, Inc. v. United States,* 67 CCPA 32, 612 F.2d 1283 (1979); *Clipper Belt Lacer, supra,* at 536, n. 3. Consequently, while neither party contends there is any special commercial meaning, the trade usage of the term "threaded" applied to tubes as connoting functions of joinder or attachment is quite relevant in determining common meaning.

### VII.

The parties refer to the generally helpful, but non-binding, Customs Co–Operation Council's Harmonized Commodity Description and Coding System Explanatory Notes ("Explanatory Notes") for Headings 7304, 7407 and 7411.[2] However, the Explanatory Notes cited by the parties insofar as they address the classification of "finned or gilled tubes and pipes" do not address the issue of whether helically finned tubes are "threaded" within the purview of Note 1(h), and therefore, give little guidance in resolving the precise issue presented here.

### VIII.

The court must consider a very disturbing aspect of rejecting plaintiff's claim that the merchandise should have been classified by Customs as tubes under Heading 7411.

**2.** *Marubeni Am. Corp. v. United States,* 35 F.3d 530, 535, n. 3 (Fed.Cir.1994); *Lynteq, Inc. v. United States,* 976 F.2d 693 (Fed.Cir.1992); *Ugg Int'l, Inc. v. United States,* 17 CIT 79, 813 F.Supp. 848, 853 (1993); *Mita Copystar Corp. v. United States,* Slip Op. 93–76, 1993 WL 179285 (CIT May 20, 1993); *Pfaff Am. Sales Corp. v. United States,* 16 CIT 1073, 1992 WL 391085 (1992). *See also Medline Industries, Inc. v. United States,* 62 F.3d 1407 (Fed.Cir.1995).

The HTSUS was based on the Harmonized System, a nomenclature system developed by the Customs Cooperation Council for use in classification of goods for customs tariff, statistical and transport documentation purposes. The Explanatory Notes constitute the Customs Cooperation Council's official interpretation of the Harmonized System. *See* H.R.Conf.Rep. No. 100–576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.

Merchandise similar to the subject internally grooved tubing has been imported into the United States since approximately 1982, and was consistently classified by Customs under the Tariff Schedules of the United States ("TSUS") as "tubes" of copper under item 613.02. Indeed, in a formal ruling issued by Customs in 1982 (plft's exh. 5), the agency ruled that Hitachi's tubing having "inner grooves that are said to improve the flow of liquid in air conditioning operations" was classifiable under the provision for pipes and tubes in item 613.02, TSUS, at the rate of 2.4 percent ad valorem. However, the internal grooving of the merchandise had no significance to the classification of pipes and tubes under item 613.02, as those terms were then defined under Headnote 3(e), Part 12, Schedule 6, TSUS.

The Harmonized Tariff Schedule of the United States ("HTSUS") superseded the TSUS effective January 1, 1989 and classification of copper tubes and pipes were under HTSUS subheading 7411.10.0000, subject to a *new definition* for tubes and pipes in Note 1(h) of Chapter 74. Thus, for the *first time* in the tariff classification of tubes and pipes, Customs had to address specifications of "uniform wall thickness" and "threaded," and in liquidating the entries covered by the current case as "profiles" Customs determined that plaintiff's imports failed to meet the new definition of a "tube."

As clear indicia of the legislative intent of a continuity of the TSUS treatment of plaintiff's tubes under the HTSUS, plaintiff strongly relies on the 1982, 1983, and 1988 International Trade Commission ("ITC") "Conversion Reports": *The Draft Conversion of the Tariff Schedules of the United States Into The Nomenclature Structure of the Harmonized System*, Vol. 16, Section XV, Chapters 74–81, USITC Pub. No. 1213, Aug. 1982 ("1982 Conversion Report"), particularly the table at 81–9 (plft's exh. 6); *Conversion of the Tariff Schedules Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report*, USITC Pub. No. 1400, at v and at p. 31 (June 1983) (plft's exh. 10); and *Continuity of Import and Export Trade Statistics After Implementation of the Harmonized Commodity Description*

*and Coding System*, USITC Pub. No. 2051 (January 1988). Prior to enactment of HTSUS, to assist the international trade community in the classification of goods, the Commission cross-referenced item numbers of the TSUS to proposed subheadings of the HTSUS indicating correlation between the TSUS classification under item 613.02 and the proposed new corresponding classification under subheading 7411.10, the classification now claimed by Marubeni.

Plaintiff accordingly insists, with some justification, that all tubing formerly classified under item 613.02, TSUS, now must be classified under the cross-referenced provision in the HTSUS as copper tubes. Defendant, on the other hand, quite correctly maintains that, particularly in the classification of copper tubes and pipes under the HTSUS, an intent that there be 100 percent correlation in the conversion from TSUS to HTSUS should not be adduced from the conversion reports in view of the changed definition of tubes and pipes in the HTSUS.

That the conversion cross-reference must in all cases be approached cautiously as a guide to the scope of HTSUS provisions was pointed up by the Commission itself in the 1988 ITC report, USITC Pub. No. 2051 (Jan. 1988):

> The cross-references are designed to assist the international trade community in translating a known classification in the TSUSA into a *likely* classification under HTS. <u>The user is strongly cautioned against relying on the cross-reference in order to determine legally appropriate tariff classifications under the HTS.</u> Such determinations can only be made by the U.S. Customs Service and depend upon the condition of an article as imported, the applicable article provisions and rules of classification set out in the HTS, and the body of customs practices and regulations relevant to the importation. <u>These cross-references are not intended, nor should they be viewed as a substitute for, the traditional tariff classification process.</u> [Emphasis added.]

To the same effect, also see Customs' TSU-SA/HTSUS Cross Reference Clarification, of July 13, 1988, "Notice of Use Limitations on

TSUSA/HTSUS Cross Reference (USITC Publication 2051)," F.R., vol. 53, No. 139, page 27447, July 20, 1988 (notified importers that the cross-references "should not be viewed as a substitute for the traditional tariff classification process").

The "traditional tariff classification process", of course, involves *inter alia,* an application of not merely the language of the subheadings, but importantly the definitional notes interpreting the language of the subheading. If the meaning of a term in a definitional note requires elucidation, as indicated *supra* in regard to the term "threaded" in Note 1(h), the court interprets the term in conformance with the common meaning of the term.

In sum, the Commission cautioned that notwithstanding its conversion analysis, the scope of a tariff term must still be derived from the traditional interpretive methodologies, including definitional notes and the common meaning of the terms used therein. While the conversion cross-reference may generally be a useful guide to classification for the Customs community, the court must agree with defendant that conversion cross-reference may not be a reliable guide where the HTSUS definition of a product is materially different from the TSUS definition. Hence, products that were classifiable as tubes under the TSUS might not satisfy the new (and narrower) definition of "tubes" under HTSUS.

Unlike the definition of "tubes and pipes" under Note 1(h) to Chapter 74, HTSUS, the definition of "pipes and tubes and blanks therefor" under headnote 3(e), Part 2, Schedule 6, TSUS, had no requirement that a product have a uniform wall thickness—unless "threaded." As previously observed, Headnote 3(e), TSUS, defining tubes and pipes, unlike Note 1(h) of Chapter 74, HTSUS, raised no issue of whether a product had a "uniform wall thickness" or was "threaded." Congress was cognizant that there were a significant number of changes in nomenclature from the TSUS to the HTSUS, and that therefore, decisions by Customs and the courts interpreting TSUS provisions could not be deemed as dispositive in interpreting the HTSUS. *See* H.R.Rep. No. 576, 100th Cong., 2nd Sess. 549 (1988); *1988 U.S.Code Cong. Ad.News* 1547, 1582. Customs' 1982 ruling on the classification of the subject merchandise (plft's exh. 5) is inoperative under the HTSUS.

### CONCLUSION

Whether Hitachi's Thermofin internally enhanced tubing be denominated in the trade as helically "grooved," "finned," "ridged," "ribbed," or "roughened," the internal surface is not "threaded" within the common meaning of that term as used in Note 1(h), and consequently plaintiff's merchandise is not classifiable as tubes under the new HTSUS definition. Accordingly, the merchandise was properly classified by Customs as "profiles" under subheading 7407.10.10, HTSUS.

Plaintiff's motion for summary judgment is denied, and defendant's cross-motion for summary judgment dismissing this action is granted. Judgment shall be entered accordingly.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED: Plaintiff's motion for summary judgment is denied, and defendant's cross-motion for summary judgment dismissing this action is granted. Accordingly, this action is hereby dismissed.