**MARCOR DEVELOPMENT CORPORATION,**
**Plaintiff,**

*v.*

**UNITED STATES, Defendants.**

**Slip Op. 96–71.**
**Court No. 94–08–00456.**

United States Court of International Trade.

May 3, 1996.

Sidney N. Weiss, New York City, for plaintiff.

Frank W. Hunger, Assistant Attorney General; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mikki Graves Walser, Esq.); Karen P. Binder, Office of Assistant Chief Counsel, United States Customs Service, of counsel, for defendant.

## Opinion and Order

NEWMAN, Senior Judge.

The issue presented concerns the proper tariff classification and rate of duty to be assessed by the United States Customs Service ("Customs") on merchandise described by plaintiff as "Shark Cartilage Protein Food Grade," imported during 1993. Jurisdiction is predicated on 28 U.S.C. § 1581(a), and therefore Customs' classification is subject to *de novo* review by this court in accordance with 28 U.S.C. § 2636. Currently before the court are cross-motions for summary judgment.

The merchandise in question was classified by Customs under subheading 2106.90.65 of the Harmonized Tariff Schedule of the United States ("HTSUS"), which applies to "food preparations not elsewhere specified or included," and duty was assessed at the rate of 10 per centum *ad valorem*. Plaintiff, the importer of record, maintains that the shark cartilage contained in its product should be considered to be "fish." Therefore, plaintiff reasons, the classification by Customs under subheading 2106.90.65, HTSUS is precluded by virtue of Chapter 21 Note 1(e) which specifically states that the chapter does not apply to food preparations containing more than 20 percent by weight of "fish."

Plaintiff suggests four alternative classifications. First, plaintiff asserts that its product should be classified under subheading 1603.00.90, HTSUS, which provides for "extracts and juices of meat, fish or crustaceans, molluscs or other aquatic invertebrates." In the alternative, plaintiff claims that its merchandise can be classified under either subheading 0305.10.20 or subheading 0305.59.20, HTSUS. Subheading 0305.10.10 applies to "Flours, meals and pellets of fish, fit for human consumption: In bulk or in immediate containers weighing with their contents over 6.8 kg each." Subheading 0305.59.20 describes "[d]ried fish, whether or not salted but not smoked: Other: Shark fins." Finally, plaintiff argues that at the very least the merchandise should be classified under subheading 0410.00.00, HTSUS, a basket provision for "edible products of animal origin, not elsewhere specified or included."

In its cross-motion for summary judgment, defendant insists that shark cartilage, in the form imported by plaintiff is not "fish," and therefore, the exclusion found in Chapter 21, Note 1(e) is inapplicable. Defendant further responds that plaintiff's alternative classifications are incorrect as a matter of law since the product cannot be properly classified under the various "fish" subheading advanced by plaintiff. Lastly, defendant argues that plaintiff's product cannot properly be classified under the proposed basket provision because the product is properly described by Customs' proposed classification.

## UNDISPUTED FACTS

The parties agree that there is no genuine dispute as to any material fact. Plaintiff's Memorandum of Law in Support of Summary Judgement, p. 9; Defendant's Re-

sponse and Cross–Motion for Summary Judgment, p. 7. Plaintiff imports merchandise consisting of between 52% and 60% by weight shark fin cartilage, and between 40% and 48% dextrin. The product is then processed by shredding the shark fin cartilage and subjecting it to a protease which removes impurities such as ash, thereby yielding purified and soluble shark cartilage. An enzyme is added to the cartilage in order to extract and concentrate the mucopolysaccharides. The cartilage is deodorized, decolored, and filtered. Dextrin, which serves as a drying agent, is subsequently added and the resulting product is sterilized and dried. After it is shredded, the cartilage is put through a spray dryer. The sole purpose for the addition of dextrin is to avoid any clogging of the spray dryer by the cartilage. After this process is completed the mixture is exported to the United States in 40 kilogram drums. The product is then sold by Marcor to third parties who repackage the merchandise in bottles and in capsules and sell it, otherwise unchanged, as a nutritional supplement.

## DISCUSSION

■ Under the rules of this Court, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT R. 56(d). The court agrees with the parties that there are no genuine material factual issues in dispute, and that the issues of law raised may appropriately be resolved by summary judgment. *Lynteq, Inc. v. United States,* 976 F.2d 693 (Fed.Cir.1992); *Mingus Constructors Inc. v. United States,* 812 F.2d 1387 (Fed.Cir.1987); *Totes Inc. v. United States,* 18 CIT ——, 865 F.Supp. 867, 870 (CIT 1994), *aff'd,* 69 F.3d 495 (Fed.Cir.1995). In making the determination as to where plaintiff's product is properly classified under the HTSUS, the Court must consider whether "the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,*

733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed.Cir.1984).

■ With respect to the classification, defendant seeks reliance on the statutory presumption of correctness. *See,* 28 U.S.C. § 2639(a)(1). The Federal Circuit, however, has expressly stated that when there is "no factual dispute between the parties, the presumption of correctness is not relevant." *Goodman Manufacturing, L.P., v. United States,* 69 F.3d 505, 508 (Fed.Cir.1995) (stating that "the statutory presumption, found in 28 U.S.C. § 2639(a)(1), that Customs' decisions have a proper *factual* basis unless the opposing party proves otherwise" was not applicable in a summary judgment context) (emphasis added). Since this matter is before the court on summary judgment cross-motions, the only questions to be resolved are legal in nature, and there are no genuine issues of material facts before the court. Thus, the presumption of correctness plays no role with respect to the claims raised in this case.

### A.

■ For the following reasons, the court finds Customs' classification assigned to plaintiff's product to be incorrect. This determination turns on the meaning of the term "fish." Customs classified the shark cartilage product under Heading 2106, HTSUS, which includes "Food preparations not elsewhere specified or included." However, Chapter 21, Note 1(e), provides that the chapter does not include:

(e) Food preparations, other than the products described in heading 2103 or 2104 containing more than 20 percent by weight of sausage, meat, meat offal, blood, fish or crustaceans, molluscs or other aquatic invertebrates, or any combination thereof (chapter 16).

Under Rule 1 of the General Rules of Interpretation ("GRI") of the HTSUS, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes." Since the GRI's are part of the HTSUS and are considered to be statutory provisions for all purposes, the court must first consider the heading and chapter notes of Chapter 21.

*See* 19 U.S.C. §§ 1204(a) and 1204(c). Hence, if plaintiff's product contains 20% or more of "fish," then necessarily Customs' classification fails as a matter of law.

■ Plaintiff maintains that the term "fish," as used in Note 1(e) to Chapter 21 includes the shark cartilage product it imports. While both parties agree that the shark is a fish, defendant responds that "although the imported merchandise may contain more than 20 percent of material derived from shark fin cartilage, it does not contain over 20 percent fish." Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, p. 11. The term "fish" as used in Note 1(e) is itself statutorily undefined. "It is well settled that the meaning of tariff terms is a question of law, while the determination whether a particular item fits within that meaning is a question of fact." *E.M. Chemicals v. United States,* 920 F.2d 910 (Fed.Cir.1990); *Stewart–Warner Corp. v. United States,* 748 F.2d 663 (Fed Cir.1984); *Marubeni v. United States,* 19 CIT ——, 905 F.Supp. 1101, 1105 (CIT 1995). Thus, the determination of what "fish" means in the context of Note 1(e) is a question of law for this court to determine. *Hafele America Co. Ltd. v. United States,* 18 CIT ——, 870 F.Supp. 352, 354 (CIT 1994) (meaning of a tariff term is appropriate for summary judgment resolution).

■ Tariff terms that are statutorily undefined are construed in accordance with their common and popular meaning, in the absence of a proven commercial meaning different from the common meaning or contrary legislative intent. *Lynteq, Inc. v. United States,* 976 F.2d 693, 697 (Fed.Cir.1992). Here, each party offers a different common meaning for the term "fish." Defendant alleges that the definition of "fish" is limited to "flesh of fishes." Defendant's Memorandum in Opposition, p. 12. Clearly, cartilage is not "flesh," and therefore, if defendant's definition is accepted as the common meaning of "fish," plaintiff's product would not fall under the exclusion articulated in Note 1(e). On the other hand, plaintiff contends that defendant's definition is far more limited than was intended by the HTSUS. While agreeing, that "flesh of fish" properly falls within the

common meaning of the term "fish," plaintiff argues that the definition was intended to be broader in scope and includes all parts of the fish. In resolving this dispute, the court finds that the clear intent of Congress was to apply a broad definition to the term "fish."

■ "As with any statute, construction of a tariff provision must begin with a consideration of the statutory language itself." *Trans–Border Customs Services v. United States,* 18 CIT ——, 843 F.Supp. 1482, 1485 (CIT 1994), *aff'd,* 76 F.3d 354 (Fed.Cir.1996); *See, Consumer Products Safety Commission v. GTE Sylvania Inc.,* 447 U.S. 102, 108 (1988); *Anhydriedes & Chemicals, Inc. v. United States,* 20 CIT ——, Slip Op. 96–49, 1996 WL 109436 (March 7, 1996) (to consider the proper classification, the court must begin with the plain language of the statute). Where the language of a statute demonstrates a clear intent of Congress, that intent is regarded as conclusive. *Negonsott v. Samuels,* 507 U.S. 99, 103–06, 113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457 · (1993); *Norfolk and Western Ry. Co. v. United States,* 18 CIT ——, 869 F.Supp. 974, 979 (CIT 1994), *aff'd,* 62 F.3d 1395 (Fed Cir.1995).

■ While each definition proffered by the parties is plausible under Note 1(e), the fact that there are two possible definitions does not in of itself render the statute ambiguous. It is well settled that "ambiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner,* —— U.S. ——, ——, 115 S.Ct. 552, 555, 130 L.Ed.2d 462 (1994). When engaging in statutory construction, the court must look to the entire context of the relevant section of the statute and not merely to the individual word. *King v. St. Vincent's Hosp.,* 502 U.S. 215, 220–221 n. 9, 112 S.Ct. 570, 573–574 n. 9, 116 L.Ed.2d 578 (1991) ("The meaning of statutory language, plain or not, depends on context"); *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991) (statutory language is determined by reading the statute as a whole). "When a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which definition best invokes the legislative intent." *Marubeni America Corp.*

*v. United States*, 19 CIT ———, 905 F.Supp. 1101, 1105 (CIT 1995); *see also, Richards Medical Co. v. United States*, 910 F.2d 828, 830–31 (Fed.Cir.1990); *Clipper Belt Lacer Co., Inc. v. United States*, 14 CIT 146, 150, 738 F.Supp. 528, 534 (CIT 1990), *aff'd*, 923 F.2d 835 (Fed.Cir.1991). In this case, the context of Note 1(e) in which the term "fish" is used negates defendant's restrictive definition.

After reviewing the specific text in which the term "fish" appears in Note 1(e), it is apparent that Congress had no intention to limit the definition of "fish" to simply the flesh of the animal. Note 1(e) specifically excludes from Chapter 21, all products which contain more than 20% by weight of sausage, meat, meat offal, blood, fish, etc. In the context in which "fish" is used in Note 1(e), defendant's definition is incorrect. By examining what items were included in this Note, it becomes readily apparent that the provision was meant to include all of the edible as well as inedible portions of animals. More, because the Note is not limited to "meat," which is commonly understood as the flesh of animals, but also includes such terms as "meat offal" and "blood," the provision obviously sought to encompass more than merely the flesh of animals. *See, Ameliotex, Inc. v. United States*, 565 F.2d 674, 677 (Cust.Pat. App.1977) ("Congress is presumed not to have used superfluous words in a statute.").

Inclusion of the term "meat offal" in the provision is particularly noteworthy. Meat offal is defined as "the parts of a butchered animal removed in dressing it, esp. The inedible parts as (in American packing houses) the digestive tract, blood, lungs, and feet, and in cattle and sheep also the head, used as raw material for further manufacture, usually into inedible products." *See, Webster's New International Dictionary*, 2d edition. Similarly, the inclusion of the term "blood" indicates that the intention of Note 1(e) is to exclude from classification under Chapter 21 any product containing more than 20 percent by weight of portions of the animal other than the flesh. There is no rational reason why the court should presume that this provision intended a different meaning for fish as opposed to any other animal. Considering

that the term "fish" may include the animal as a whole, it is understandable that Congress did not feel the need to also include terms such as "fish offal" or any other term descriptive of anything less than the entire fish.

Along the same lines, it is conceivable that if the tariff provision applied only to flesh of fish, as defendant alleges, Congress could have made that restriction clear by using only the term "meat," which is commonly understood as the flesh of animals. Flesh of fish could be and is called meat within the HTSUS language. *See*, Explanatory Note 03.04(1) (defining "fillet of fish" as the meat of the fish). Instead, the intention was to include in Note 1(e), all parts of the animal, thus the specific delineation of "meat" "meat offal," "sausage," and "blood." In this context, the only reasonable interpretation of the Chapter Note's language is that "fish" was intended to mean the whole body of a fish.

It is noteworthy that defendant's proposed definition of "fish" is very similar to the definition set forth in the Explanatory Notes for "fish fillets." Fish fillets are defined as "the strips of meat cut parallel to the backbone of the fish and constituting the right or left side of a fish insofar as the head, guts, fins (dorsal, anal, caudal, ventral, pectoral) and *bones* (spinal column or main backbone, ventral or costal bones, branchial bone or stapes, etc.) have been removed and the two sides are not joined together, for example by the back or belly." *Explanatory Notes*, 03.04(1) (emphasis added). Plainly, "fish fillets" refer only to the flesh or meat of the fish, yet the term "fish fillets" was not used in Note 1(e). Therefore, it can be concluded that by using the term "fish," rather than "fish fillets," Congress sought the definition of "fish" under the HTSUS to by more expansive than simply the flesh or meat of a fish. *See generally, Chicago v. Environmental Defense Fund*, ——— U.S. ———, ———, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994) ("It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.").

■ Defendant offers no explanation as to why bones of all other animals would be

included in the Chapter Note's prohibition by virtue of the broad term "meat offal," yet the skeletal structure of a fish would be excluded. To accept the limited definition of "fish" offered by defendant would not only run afoul with the context of the statute, but would create an anomalous result which is to be avoided. Defendant's proposed definition assumes an intention for "fish," as it appears in Note 1(e), to be limited only to the flesh of fish when there exists no evidence of such an intention. When a possible definition is at variance with the demonstrated legislative intent, it is the intent of the legislature which is to be followed. *Kyocera International, Inc. v. United States*, 2 CIT 91, 96, 527 F.Supp. 337 (CIT 1981), *aff'd*, 681 F.2d 796 (Fed.Cir.1982); *see also*, Sturm, *Customs Law & Administration*, § 51.4 at 47 ("the fact that inconsistent or absurd results may flow from one construction and not another will often lead the court to adopt the latter as most likely expressing the legislative intent"). Consequently, because defendant's limited definition of "fish" would frustrate the intent of the provision based on the context of its language, thereby creating an anomalous result, the court rejects that definition and finds that "fish" in the context of Note 1(e) includes any parts of the fish, including the skeletal structure.

■ The court bases this interpretation not only on the language of the tariff provision but also finds support in prior judicial authority. Decisions of both the Customs Court and Court of Customs Appeals provide guidance with respect to the term "fish." Although there are no prior cases which specifically address the issue of shark cartilage classification, those few cases defining fish demonstrate that the term has never been narrowly defined. When deciding whether the sperm of a male herring constituted

"fish," the Court of Customs Appeals opined that:

> We believe that such a substance [male herring sperm] does not come within the common understanding of the term "fish." It is merely a secretion of the fish and does not form any part of the flesh or organic structure. It is therefore not covered by the classification "all other fish" contained in the free list...

*United States v. Carnegie*, 8 Ct.Cust.App. 377, 378 (1918). Accordingly, for tariff purposes, the *Carnegie* court considered any part of a fish's "flesh or organic structure" to be "fish". Under this judicial definition of the term "fish," cartilage, which is certainly part of a fish's "organic structure" would be considered fish [1]. Similarly, other definitions of the term "fish" have been extended beyond merely the flesh of fish. When addressing what constituted "fish" for determining its weight, the Court of Customs Appeals held that all of the edible and inedible parts of fish should be considered to be "fish itself." *Rosenstein Bros. v. United States*, 4 Ct.Cust.App. 401, 403 (1913). After pointing out that the liquid in question was not artificially added, the court stated:

> This [liquid] content is in effect part of the fish. If allowance were sustained for the oil expressed from the fish, upon the ground claimed by appellant that it was useless and thrown away, we might well expect this case to be followed by claims for the heads, tails, fins, and *bones* of the fish, which likewise are not used and are thrown away. Of necessity all such nonedible parts enter into the weight and value of the fish as bought and sold and are *part of the fish itself.*

*Id.* (emphasis added). Also of note is the fact that the Customs Court has previously stated that shark fin alone, from where plaintiff's cartilage is derived, is likewise consid-

---

1. Defendant attempts to argue that the "end product, [plaintiff's imported product] is not fish at all, but is instead a mixture of protein, mucopolysaccharides, and dextrin." Defendant's Brief, p. 14. This argument is unpersuasive and misleading considering the fact that any part of an animal can be described by a chemical analysis of its components without changing those components. Under such an analysis even if the product consisted entirely of shark flesh, which

defendant concedes would be excluded from classification under Chapter 21, the flesh nonetheless could be claimed to be nothing but protein and fats. Such chemical analysis would not change the fact that the product in question was still the flesh of fish. Therefore, defendant's reliance on the chemical breakdown of plaintiff's imported product is not relevant to the question of whether the cartilage should be consider "fish."

ered to be part of "fish." *Ti Hang Lung & Co. v. United States,* 32 Cust.Ct. 478, 480 (1954).

Since defining fish solely as "flesh of fish" would contravene the intent of Congress as established by the context of Chapter 21 Note 1(e), would create an anomaly in the reading of the statute, and is not supported by the historical judicial definitions of "fish," the court rejects defendant's narrow definition of that term. After a review of the statute and judicial precedents, the court finds that "fish" for the purpose of Chapter 21, Note 1(e), HTSUS includes the flesh or organic structure of the animal fish. Since shark fin cartilage falls under this definition of "fish," the classification assigned to plaintiff's product by Customs is incorrect as a matter of law[2]. Accordingly, the court must now consider the proper classification for plaintiff's product.

## B.

■ Plaintiff proposes four alternative classifications for its product. Initially, plaintiff maintains that the proper classification of its product would be under Chapter 16, HTSUS, entitled: "Preparations of meat, of fish or of crustaceans, molluscs or other aquatic invertebrates." Plaintiff argues that Heading 1603 is most applicable. It provides for:

> Extracts and juices of meat, fish or crustaceans, molluscs or other aquatic invertebrate:
>
> 1603.00.10 Clam juice ...........
> 1603.00.90 Other................

Unlike the prohibitions found in Chapter 21's Note 1(e), the language of Chapter 16, Note 2, provides that "[f]ood preparations fall in this chapter provided that they contain more than 20 percent by weight of sausage, meat, meat offal, blood, fish or crustaceans, molluscs or other aquatic invertebrates, or any combination thereof." Thus, as a prerequisite for classification under Chapter 16,

plaintiff's product must contain more than 20% of "fish." For the reasons stated earlier, the court finds that plaintiff's product does contain more than 20% by weight of "fish." Pointing to this Chapter Note, plaintiff insists that because its product contains more than 20% fish, "it is clear that the merchandise meets the definition of the headnote and should be classified under this provision [subheading 1603.00.90]." Plaintiff's Reply Memorandum, p. 12. In making this claim, plaintiff ignores the fact that this Note only sets forth a prerequisite for classification under Chapter 16. While a product which consists of more than 20 percent fish, may be classified under Chapter 16, the product must still fit the specific descriptions of the items contained within the subheading. Contrary to plaintiff's argument, the product may not be automatically classified under subheading 1603.00.90, by virtue of the amount of fish contained in the product.

■ Hence, the issue presented to the court by this proposed classification, is what constitutes an "extract[3]." Defendant contends that even if the court were to find that the product contains more than twenty percent "fish," it is not an extract and is therefore not classifiable under this provision. For the following reasons, the court agrees that plaintiff's product is not an extract and therefore is not classifiable within subheading 1603.00.90, HTSUS.

■ When attempting to define a tariff term, the court may consult lexicographic and scientific resources. *C.J. Van Houten & Zoon v. United States,* 11 CIT 409, 410, 664 F.Supp. 514, 516 (CIT), *aff'd* 835 F.2d 864 (Fed.Cir.1987) The common thread running through the various dictionary definitions of "extract" is that an extract must maintain the essence of the main source. Extract is defined as: "a preparation containing the essence of the substance from which it is derived: Essence Concentrate." *Webster's Third New International Dictionary;* "a

2. It is important to note that this decision does not classify plaintiff's entire product as "fish" but only holds that the imported product contains more than 20% of "fish."

3. Although this heading also covers juices, plaintiff makes no claim that its powdery product is a juice. Moreover, since juice is commonly understood to be a fluid, any claim that plaintiff's product is a juice would not withstand judicial scrutiny.

preparation supposed to possess the virtue of the original substance in concentrated form." *Webster's New International Dictionary, 2nd Edition;* and a "concentrated preparation of the essential constituents of a food, flavoring, or other substance; concentrate." *The American Heritage Dictionary, 2nd edition.* While it is true that the merchandise in question is made up of approximately 50% of shark cartilage, the cartilage was treated with an enzyme, mixed with dextrin, which comprises almost half of the final product, produced in powdered form, is not concentrated, and does not have the same odor, color or taste as simple shark fin cartilage. In comparing plaintiff's product with the general definitions of extract, it is clear that the product has not maintained the essence of the original shark cartilage.

■ The Explanatory Notes to Heading 16.03, HTSUS provide even more specific guidance as to the meaning of the term "extract." These Notes constitute the Customs Cooperation Council's official interpretation of the Harmonized System upon which the HTSUS was based. While certainly not binding upon the court, the Explanatory Notes have been endorsed as "useful guides to understanding the HTSUS." *Ugg International, Inc. v. United States,* 17 CIT 79, 84, 813 F.Supp. 848, 853 (CIT 1993); *see also, Marubeni Am. Corp v. United States,* 35 F.3d 530, 535 n. 3 (Fed.Cir.1994); *Mita Copystar Corp. v. United States,* 17 CIT 374, 378–79, 1993 WL 179285 (CIT 1993); *Pfaff American Sales Corp. v. United States,* 16 CIT 1073, 1076, 1992 WL 391085 (CIT 1992). Because the Explanatory Notes specifically define and explain the term "extracts of fish" under this subheading, the court finds the Notes quite persuasive in determining what constitutes an extract. The Explanatory Notes state as follows:

Though obtained from different sources, the extracts of this heading have very similar physical characteristics (appearance, odour, flavour, etc.) And chemical composition.

The heading includes:

\* \* \* \* \* \*

(3) **Extracts of fish or crustaceans, molluscs or other aquatic invertebrates.**

Extracts of fish are obtained, e.g., by concentrating water extracts of the flesh of herring or other fish or made from fish meal (whether or not defatted); during the production all or part of the constituents which give the fishy taste (e.g., trimethylamine in the case of sea fish) may be eliminated and such extracts therefore have characteristics similar to those of meat extracts.

\* \* \* \* \* \*

Extracts are used for making certain food preparations such as soups (whether or not concentrated) and sauces.

(emphasis in the original).

Under this explanation of how to interpret the term extract, it is clear that plaintiff's product cannot be defined as such. Initially, an "extract" as defined in the Explanatory Notes is made specifically from either the flesh of fish or fish meal. Plaintiff's product is shark cartilage and dextrin, and is not derived from either the flesh of fish or fish meal. Thus, according to the guidance provided by the Explanatory Notes, this product cannot be considered to be an "extract."

Moreover, nowhere in the Explanatory Notes is there an indication that anything other than water is concentrated to make the extract. Conversely, plaintiff's product is shark cartilage that is refined, pressurized, treated with an enzyme, and mixed with dextrin. Indeed, by plaintiff's own admission, its product is not "used for making certain food preparations such as soups (whether or not concentrated) and sauces" as contemplated by the Explanatory Notes. Therefore, predicated upon the available lexicographic resources and specific definition as set forth by the Explanatory Notes, the court finds that plaintiff's product is not an extract. Consequently, notwithstanding the fact that plaintiff's product contains more than 20% fish, classification under subheading 1603.00.90 must be rejected because plaintiff's imported product cannot be considered to be an extract.

**C.**

■ Plaintiff's next two proposed alternative classifications of its product fall under

**1134**

Heading 0305, HTSUS. This Heading covers:

> Fish, dried, salted or in brine; smoked fish, whether or not cooked before or during the smoking process; flours, meals and pellets of fish, fit for human consumption

Under this Heading, plaintiff proposes two possible classifications. First, plaintiff argues that its product falls under subheading 0305.10.20 which includes: "Flours, meals and pellets[4] of fish fit for human consumption: In bulk or in immediate containers weighing with their contents over 6.8 kg each." For the following reasons, the court finds that plaintiff's product cannot be considered either fish flour or fish meal within the meaning of the subheading 0305.10.20.

As previously stated, if a term in the tariff schedule is statutorily undefined, it will be assumed that Congress intended its commercial or common meaning, absent a demonstrated contrary intent. Despite purporting that its product constitutes the flour or meal of fish, plaintiff never offers any definition of those tariff terms related specifically to fish. The only definitions offered by plaintiff are for the generic term "meal" which it describes as "a powder produced by grinding" and "any ground or powdery substance." Plaintiff's Reply Memorandum of Law, p. 14, fn. 7, *citing, Oxford English Dictionary,* 2d ed., vol. IX; *Random House Dictionary of the English Language,* 2d ed. It is well established, however, that the court will not accord significant weight to a dictionary definition which is vague or overly broad. *Mitsubishi Electronics America Inc. v. United States,* 19 CIT ——, 882 F.Supp. 171, 174 (CIT 1995). While plaintiff's product could theoretically fall under the broad and generic definitions it puts forward, the court finds that such generic terms do not set forth the common meanings of fish flour or meal. *See, Sumitronics Inc. v. United States,* 19 CIT ——, 1995 WL 45870 (1995) (tariff provisions do not necessarily include everything that falls within their literal meaning).

When describing the substances fish flour and meal[5], virtually all sources defining these terms as specific entities state that they are used interchangeably with the more general term "fish protein concentrate." *See e.g., New Encyclopedia Britannica, Macropedia,* Vol. 19, p. 289. (Defining fish flour as upgraded fish meal with the designated term fish protein concentrate); Kirk–Othmer, *Encyclopedia of Chemical Technology,* Vol. 19, p. 337 (fish protein concentrate was originally known as fish flour); *Webster II New Riverside University Dictionary, p. 482* (fish flour known interchangeably as fish protein concentrate). Moreover, whether known as fish flour, fish meal, or fish protein concentrate, as it is commonly understood, the substance is prepared by using the whole fish or parts of a fish which invariably includes the flesh. Fish protein concentrate has been defined as "prepared from *whole fish* or other aquatic animals," "prepared from edible-grade *whole fish* in accordance with food processing standards," and described as "a stable, odourless, and colorless final product is made from *white-fleshed* fish species such as hake." *Van Nostrand's Scientific Encyclopedia,* 7th ed., p. 1164; *Encyclopedia of Chemical Technology,* at 337; *Britannica* at 289 (emphasis added). Plaintiff's product uses shark fin cartilage, a much more limited portion of the fish than is ordinarily contained in fish flour or meal. Additionally, the most common preparation of fish flours and meals is through either wet or dry rendering[6]. *See, Van Nostrand's* at 1164;

---

**4.** Both parties agree that plaintiff's product is not a "pellet" as described in the HTSUS. Chapter 3, Note 2 of the HTSUS provides that "[i]n this chapter the term *"pellets"* means products which have been agglomerated either directly by compression or by the addition of a small quantity of binder." Plaintiff's product has not been agglomerated and therefore cannot be considered a pellet.

**5.** Fish meal, traditionally used as fertilizer and animal feed, is a lower grade of the substance commonly understood to be fish flour.

**6.** "In the United States, two principal methods of reduction are used [to create fish flours and meals]: (1) wet rendering, in which the oil is removed before the fish material is dried; and (2) dry rendering in which the oil is removed after drying." *VanNostrand's* at 1164. Wet rendering requires the cooking of the fish and the pressing of the oil and other liquid before the fish is ultimately dried. *Id.* Dry rendering involves loading the fish into a large cylindrical drier, the oil is then expressed and the remaining solid material is ground into meal or flour. *Id.* While these are not necessarily the exclusive methods

*McGraw–Hill Dictionary of Scientific and Technical Terms,* 4th ed., p. 722 ("fish meal [FOOD ENG] A protein rich dried fool product produced from the inedible portions of fishes by dry or wet rendering").

In sum, plaintiff provides no support for its contention that powdered shark fin cartilage mixed with dextrin, constitutes fish flour or meal. Indeed, the wealth of authorities demonstrate that contrary to plaintiff's claim, fish flours and meals are made from the whole fish or at least portions of the fish which include the flesh. Since plaintiff's product contains no fish flesh and is nothing more than shark fin cartilage mixed with dextrin, it cannot be considered fish flour or meal as those terms are commonly understood. Moreover, the court is unaware of any authority that supports plaintiff's assertion that fish flour or meal, as it is commonly understood, is processed in the way plaintiff creates it product. Finally, in conjunction with all of these reasons why plaintiff's product does not constitute fish flour or meal, the court finds it significant that plaintiff does not market or advertise its product as either fish flour or meal. *Nadel & Sons Toy Corp. v. United States,* 4 CIT 20, 22, 1982 WL 2242 (1982) (manner of a product's marketing is a factor to be considered in determining proper classification). For all of these reasons, the court finds that plaintiff's product cannot be classified under subheading 0305.10.20, HTSUS.

■ Plaintiff next contends that its product should be classified under a different provision of Heading 0305, HTSUS which provides for:

**Heading 0305** Fish, dried, salted or in brine; smoked fish, whether or not cooked before or during the smoking process; flours, meals and pellets of fish, fit for human consumption:

Dried fish, whether or not salted but not smoked:

| | |
|---|---|
| 0305.51.00 | Cod (Gadus morhua, Gadus ogac, Gadus macrocephalus) |
| 0305.59 | Other: |
| 0305.59.20 | Shark fins |

used to produce fish flour or meal, plaintiff provides no evidence that fish flour or meal, as

Specifically, plaintiff alleges that since its product is a mixture of dextrin and shark fin cartilage, it should be classified as "shark fins" under subheading 0305.59.20, HTSUS. While it is undisputed that the cartilage in plaintiff's product was obtained from a shark fin, the court finds that plaintiff's product does not constitute "Shark fins" as provided for under subheading 0305.59.20.

The Explanatory Notes again provide guidance as to the extent of processing that was envisioned for shark fins under this tariff provision. As previously stated, while cognizant that the Explanatory Notes are not binding, the court nonetheless finds this Note persuasive and helpful in determining if plaintiff's product should properly be classified as "shark fins." The Explanatory Notes state that: "Unskinned sharks fins, simply dried, and parts of sharks' fins which have been immersed in hot water, skinned or shredded before drying are classified in this heading." Plainly, the expectation concerning the state of "shark fins" as described under the Explanatory Notes is that most of the fin will be utilized and the fin will be subjected to minimal processing.

Plaintiff's product is far more prepared than the Explanatory Notes concerning shark fins contemplate. From plaintiff's statement of undisputed facts, it is apparent that the shark fin cartilage is separated from the skin, meat, and all other parts of the original shark fin. Thus, the shark fin has been much more than "simply dried" and "skinned." Indeed, all that is left of the fin is the skeletal structure, which is then subjected to additional processing. The cartilage is shredded, an enzyme is added to the cartilage to concentrate its mucopolysaccharides, it is mixed with dextrin, and spray dried causing the cartilage/dextrin mixture to end up in its final powder form. The Explanatory Notes do not offer any basis to expect that "shark fins" as defined by the HTSUS would be reduced to their skeletal structure, and certainly there is no contemplation of a mixture between the fin and another substance. Considering the extent of the metamorphosis the natural shark fin has undergone by the

commonly understood, is prepared in the same manner as its product.

time it reaches its final state, it can no longer be said that plaintiff's product bears the essential characteristics or is even recognizable as "shark fin."

Here too, the court's determination is supported by prior judicial authority construing the term "shark fin." Resolving a remarkably similar issue, the Customs Court had to determine whether a product should be considered "shark fin" under the Tariff Act of 1930[7]. *Ti Hang Lung & Co. v. United States*, 32 Cust.Ct. 478 (1954). There, the court found that:

> the fins must be boiled in hot water for approximately 2 to 3 hours before it is sufficiently soft that the outer skin and scum could be scraped off. The waste gelatinous matter is discarded so that only the inner meat, which is the edible substance is exposed.... After the boiling process and the scraping of the outer skin, the edible part is dried to permit its shipment in the condition of the imported merchandise ... that is used in the preparation of "shark fin soup."

*Id.* at 479. After hearing about the processing that the shark fin was put through, the Customs Court found that the product could not be classified as "shark fin" under the tariff provision. The court stated:

> The product before us has been subjected to a series of processes through which all identity as a shark fin has been destroyed, and an edible commodity has become available. The boiling and shredding processes completely changed the form, appearance, and composition of the crude shark fin and produced an advanced product, ready to eat and available for use in shark fin soup.

*Id.* at 480. This court finds such reasoning persuasive in the case at bar. Plaintiff's

product has been subjected to a much more detailed processing than the shark fin in *Ti Hang*. In point of fact, all that is left of the original shark fin is the cartilage, which is not in any way distinguishable from the shark cartilage obtained from any other part of the shark[8]. Moreover, after an enzyme is added to the cartilage and mixed with dextrin, it is dried into powder form. The result is that plaintiff's product has one component which originally came from a shark fin, but after it is processed, what is left no longer resembles the original shark fin in any manner, nor can it be classified as such.

### D.

■■■ Plaintiff's final alternative classification is under subheading 0410.00.00 which provides for "Edible products of animal origin, not elsewhere specified or included." In support of this classification, plaintiff argues that even if the shark cartilage were not considered to be fish, "there is still no doubt that some portion of the merchandise is of animal origin and as demonstrated above, it is this component that gives the product its essential character." Plaintiff's Memorandum in Support of Summary Judgment, p. 16. Additionally, plaintiff argues that because the subheading specifies "of animal origin," it is more specific than Customs' classification which includes simply "food preparations not elsewhere specified or included." The entirety of defendant's argument responding to plaintiff's claim is merely one sentence stating: "[I]nasmuch as the merchandise is described by subheading 2106.90.65, it cannot be classified in subheading 0410.00.00, HTSUS." Defendant's Memorandum in Support of its Motion for Summary Judgment, p. 24. The court disagrees

---

7. Significantly, the Tariff provision at issue in *Ti Hang* is quite similar to the provision plaintiff points to in the HTSUS. The relevant portion of the 1930 Act provided for "fish dried and unsalted: Other, including shark fins." In the section of the HTSUS at issue, the Heading classifies "Dried fish, whether or not salted but not smoked:
Other:
   Shark Fins.
Thus, considering the context in which the *Ti Hang* was addressing the issue, its reasoning is very persuasive.

8. Again, plaintiff's own exhibit demonstrates that its product bears little relation to shark fin in that plaintiff's product is marketed as "Shark Cartilage." No reference is made to the fact that the shark cartilage in plaintiff's product was obtained from the fin of the shark. *See*, Gabarini, Supplemental Declaration, attachments. While not controlling, "the manner in which merchandise is advertised and marketed is a factor to be considered in determining its classification." *Dominion Ventures, Inc. v. United States*, 10 CIT 411, 413, 1986 WL 30007 (1986).

with defendant's statement and finds subheading 0410.00.00, HTSUS to be the proper classification for plaintiff's product.

For the reasons previously discussed, Customs' classification of plaintiff's product under subheading 2106.90.65, HTSUS is, as a matter of law, incorrect[9]. Hence, the final issue with respect to subheading question 0410.00.00 is whether plaintiff's product falls within its ambit. The parties agree, and there can be no genuine dispute, that shark cartilage is of animal origin and it is edible. Further, it is of no moment that dextrin is combined with the cartilage. As General Rule of Interpretation 2(b) makes clear:

> Any reference in a heading to a material or substance shall be taken to include a reference to mixtures or combinations of that material or substance with other materials or substances. Any reference to goods of a given material or substance shall be taken to include a reference to goods consisting wholly or partly of such material or substance. The classification of goods consisting of more than one material or substance shall be according to the principles of rule 3.

For the purposes of this classification, the applicable General Rule of Interpretation is 3(b) which provides in pertinent part that mixtures "shall be classified as if they consisted of the material or component which gives them their essential character." The only purpose served by the addition of dextrin is to prevent the cartilage from clogging the spray dryer. The value of the end product is derived solely from the cartilage and the added dextrin is nothing more than incidental. Since the cartilage is the substance that gives the product its essential characteristic, for purposes of classification the product will be considered to be wholly shark cartilage. *See,* General Rule of Interpretation 3(b). Therefore, plaintiff's product clearly fits under subheading 0410.00.00, HTSUS, because it is an edible product of animal origin and is not elsewhere specified or included, as contemplated by the subheading.

## CONCLUSION

For the foregoing reasons, the court finds that plaintiff's product was classified incorrectly and grants plaintiff's motion for summary judgment. Accordingly, defendant's cross-motion for summary judgment is denied.

Judgment will be entered for plaintiff and Customs is hereby directed to reliquidate plaintiff's product pursuant to this opinion.

**IT IS SO ORDERED.**

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now in conformity with said decision, it is hereby

**ORDERED** that plaintiff's motion for summary judgment is granted; and it is further

---

**9.** It is noteworthy that even if the court accepted defendant's argument that plaintiff's product did not contain more than 20% by weight of "fish," the correct classification would still remain under subheading 0410.00.00, HTSUS. Customs' classification under subheading 2106.10.00, HTSUS, provides for "Food preparations not elsewhere specified or included: Protein concentrates and textured protein substances." Thus, the subheading covers any food preparation regardless of the source. Conversely, plaintiff's proposed classification under subheading 0410.00.00, HTSUS provides for "edible products of *animal origin,* not elsewhere specified or included." (emphasis added). While plaintiff's product could be classified under either of these provision (assuming that Customs' proposed classification was not statutorily barred), plaintiff's proposal is the more specific of the two subheadings because those products falling under 0410.00.00 are limited to being of animal origin. Customs' classification could include products of animal origin as well as any other origin. General Rule of Interpretation 3(a) provides that:

> When by application of rule 2(b) or for any other reason, goods are, *prima facia,* classifiable under two or more headings, classification shall be effected as follows:
> (a) The heading which provides the most specific description shall be preferred to headings providing a more general description.

In this case, the imported product could fall under either of the subheading; however because subheading 410.00.00 provides the more specific description, "of animal origin," is the more appropriate subheading to describe plaintiff's product.

**ORDERED** that defendant's cross-motion for summary judgment is denied; and it is further

**ORDERED** that the United States Customs Service shall reliquidate the subject entry under subheading 0410.00.00, HTSUS, at a rate of 2.5 per centum *ad valorem,* and shall refund all excess duties with interest as provided by law.